1  Keith Scully, WSBA #28677
2  *keith@newmanlaw.com*
   Leeor Neta, *admitted pro hac vice*
3  *leeor@newmanlaw.com*
4  Newman Du Wors LLP
5  2101 Fourth Avenue, Suite 1500
   Seattle, WA 98121
6  Telephone: (206) 274-2800
7
   Attorneys for Plaintiffs
8
9
           UNITED STATES DISTRICT COURT
10         EASTERN DISTRICT OF WASHINGTON
11
   RIVER CITY MEDIA, LLC, et al.,        Case No. 2:17-cv-00105-SAB
12
            Plaintiffs,                  **PLAINTIFFS' OPPOSITION TO**
13                                       **DEFENDANTS IDG, INC., CXO**
       v.                               **MEDIA, INC., AND STEVE**
14                                       **RAGAN'S MOTION TO DISMISS**
   KROMTECH ALLIANCE               **FOR LACK OF PERSONAL**
15 CORPORATION, et al.,            **JURISDICTION, OR**
                                    **ALTERNATIVELY, MOTION TO**
16         Defendants.             **DISMISS FOR FAILURE TO**
                                    **STATE A CLAIM**
17
                                    With Oral Argument
18                                  Hearing Date:
19                                  July 13, 2017 @ 11:00 a.m.
                                    Spokane, Washington
20
21
22
23
24
25
26
27
28

PLAINTIFFS' OPP. TO DEFENDANTS IDG,        **Newman Du Wors LLP**    2101 Fourth Avenue, Suite 1500
INC., CXO MEDIA INC. AND STEVE                                       Seattle, Washington 98121
RAGAN'S MOTION TO DISMISS                                            (206) 274-2800
[2:17-cv-00105]

# TABLE OF CONTENTS

I. INTRODUCTION ............................................... 1

II. FACTS ............................................................ 1

III. DISCUSSION ............................................... 5

    A.    The IDG Defendants purposefully targeted River City's Washington-based business in their investigation and then published defamatory articles directed to Washington citizens and businesses. ...... 5

        1.    The IDG Defendants deliberately exploited Washington markets and published an article that was focused on Washington and caused harm in Washington. ...... 6

        2.    This litigation is a direct result of the harm caused by the IDG Defendants' defamatory article in Washington. ...... 9

    B.    The exercise of personal jurisdiction over the IDG Defendants is reasonable and comports with traditional notions of fair play and substantial justice. ...... 9

    C.    This Court may exercise personal jurisdiction over IDG because it is a "super-corporation" engaged in technology media publishing and marketing and its subsidiaries are its agents. ...... 11

    D.    The IDG Defendants are not entitled to their attorney's fees. ...... 12

    E.    River City has stated plausible claims for relief with well-supported and well-pled factual allegations against the IDG Defendants. ...... 13

        1.    The IDG Defendants violated the CFAA, SCA, ECPA, and DFSA because they acted in concert to infiltrate River City's computers, damage River City's network, and expose River City's confidential trade secrets via defamatory articles. ...... 13

        2.    The Ragan Article published by the IDG Defendants constitutes defamation and intentionally inflicted emotional distress on the individual Plaintiffs. ...... 15

3.    The IDG Defendants worked with and assisted Vickery in intentionally interfering with River City's contractual relationships and business expectancies. .................................. 16

4.    The IDG Defendants are liable for conversion perpetrated by their agent, Chris Vickery. ............................... 16

IV. CONCLUSION ................................................. 16

# TABLE OF AUTHORITIES

## Cases

*Amoco Egypt Oil Co. v. Leonis Nav. Co., Inc.*,
  1 F.3d 848 (9th Cir. 1993) ................................................................. 10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..........................................................................13

*Bellamo v. Pennsylvania Life Co.*,
  488 F. Supp. 744 (S.D.N.Y. 1980)......................................................11

*Burger King v. Rudzewicz*,
  471 U.S. 462 (1985) ......................................................................... 5

*Calder v. Jones*,
  465 U.S. 783 (1984) ............................................................... 7, 8, 9

*Chan v. Soc. Expeditions, Inc.*,
  39 F.3d 1398 (9th Cir. 1994) .............................................................. 5

*Daimler AG v. Bauman*,
  134 S.Ct. 746  (2014)......................................................................... 6

*Doe v. Unocal Corp.*,
  248 F.3d 915 (9th Cir. 2001) ............................................................. 6

*Duc Tan v. Le*,
  188 Wash.2d 649, 300 P.3d 356 (2013) ..............................................15

*El-Fadl v. Central Bank of Jordan*,
  75 F.3d 668 (D.C. Cir. 1996)..............................................................11

*Genetic Veterinary Sciences, Inc. v. Canine EIC Genetics, LLC*,
  No. 13-cv-422-TOR, 2014 WL 2894301 (E.D. Wash. June 24, 2014) .................. 6

*Gordon v. Ascentive, LLC*,
  No. CV-05-5079-FVS, 2005 WL 3448025 (E.D. Wash. Dec. 15, 2005) .............. 6

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945).......................................................................... 6

*Keeton v. Hustler Magazine, Inc.*,
  465 U.S. 770 (1984) ............................................................... 7, 9

*Microsoft Corp. v. Mountain W. Computers, Inc.*,
  No. C14-1772RSM, 2015 WL 4479490 (W.D. Wash. July 22, 2015) ............... 8

PLAINTIFFS' OPP. TO DEFENDANTS IDG,
INC., CXO MEDIA INC. AND STEVE
RAGAN'S MOTION TO DISMISS - iii
[2:17-cv-00105]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

*Mirza Minds, Inc. v. Kenvox U.S. L.L.C.*,
  2015 WL 6693689 (E.D. Wash. November 3, 2015) .............................................. 5

*Park Hill Corp. v. Don Sharp, Inc., Better Homes and Gardens*,
  60 Wash. App. 283 (1991) ...................................................................... 12

*Walden v. Fiore*,
  134 S.Ct. 1115, 1122 (2014) ............................................................. 6, 8, 9

*Williams v. Yamaha Motor Co. Ltd.*,
  851 F.3d 1015 (9th Cir. 2017) ................................................................ 11

**Other Authorities**

Fed. R. Civ. P 8(a)(2) ............................................................................ 13

RCW 4.28.185 (5) ................................................................................ 12

RCW 4.28.185(1) ................................................................................. 5

PLAINTIFFS' OPP. TO DEFENDANTS IDG,
INC., CXO MEDIA INC. AND STEVE
RAGAN'S MOTION TO DISMISS - iv
[2:17-cv-00105]

NEWMAN DU WORS LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

# I. INTRODUCTION

Defendants International Data Group, Inc. ("IDG"), CXO Media, Inc. ("CXO") and Steve Ragan ("Ragan") (the "IDG Defendants.") claim they are not subject to this Court's jurisdiction because (1) they did not purposefully direct their conduct into Washington and (2) none of the claims in this case arise from forum-related activities.

They are wrong. Each of the IDG Defendants knew that Plaintiffs ("River City") were located in Spokane and each collected information about River City's Washington operations. The IDG Defendants then published defamatory articles aimed at readers in Washington where River City suffered maximum damage.

The IDG Defendants also request dismissal under Rule 12. But their motions say almost nothing about the sufficiency of River City's claims. Instead, the IDG Defendants seek dismissal because they disagree with the facts. And that is not a basis for Rule 12 relief. River City states plausible claims against all the IDG Defendants. It has plead all the elements for each cause of action. And if that were not enough, the IDG Defendants' own evidence proves they worked with Vickery and knew about his hacking. The Court should reject their Rule 12 motion.

# II. FACTS

This case is about a devastating computer hacking campaign that damaged River City's technological infrastructure and the follow-up media stories and attention that ruined their reputation in the internet marketing industry. Complaint, ECF No. 1 at 2–3. Before the campaign, River City was a multi-million-dollar affiliate marketing enterprise bringing jobs and revenue to Spokane. *Id*. After the campaign, it was out of business—all because of Defendants' actions. *Id*.

The IDG Defendants played pivotal roles in analyzing River City's data— which Defendant Vickery stole. Based on that data, they then spread false, defamatory, and reputation-ruining information about River City—for example, by publishing Ragan's March 6, 2017, article titled "Spammers expose their entire

1  operation through bad backups," (the "Ragan Article"). *Id.* at 11–13.

2      CXO owns and operates the Internet security-focused website,

3  [CSOonline.com,](CSOonline.com) and hosts Ragan's blog, "Salted Hash," a blog focused on data

4  breach and cybersecurity news. Complaint, ECF No. 1 at 4; Bloom Decl., ECF No.

5  15 at 3. CSOonline.com is an internationally-known source of security news,

6  boasting 786,000 average monthly page views from 395,000 average monthly

7  unique visitors. *See* Declaration of Matt Ferris ("Ferris Decl."), ¶ 14, Ex. 4 (CSO

8  Media Kit, available at [https://www.idgenterprise.com/reach/cso/,](https://www.idgenterprise.com/reach/cso/) last visited

9  April 28, 2017). CSOonline.com calls itself the "leading source" for security

10  professionals to "connect exclusively with key security decision-makers." *Id.*

11      IDG is a holding company incorporated and based in Massachusetts. Bloom

12  Decl., ECF No. 13 at 2–3. IDG argues it is not the parent corporation of CXO

13  because CXO is a "separate and distinct legal entity" and IDG "does not control

14  the day-to-day activities" of CXO. *Id.* at 3–4. But in fact, IDG, its subsidiary IDG

15  Enterprise, Inc., and CXO all share executives and are part of a single media

16  conglomerate. Declaration of Amber Paul ("Paul Decl."), ¶ 7. Edward Bloom is (or

17  was at all times relevant to this case) the President, Chief Financial Office and

18  Treasurer for IDG. Bloom Decl. ¶ 2, ECF No. 13 at 2. He is (or was at all times

19  relevant to this case) also the Vice President and Treasurer for CXO. Bloom Decl.

20  ¶ 2, ECF No. 15 at 2. IDG, IDG Enterprise, and CXO all maintain publicly

21  available websites containing information about themselves and their brands. Paul

22  Decl. ¶ 7.

23      These websites clearly show that CSO is a brand of IDG Enterprise. But they

24  also disclose the identities of officers and executives shared between IDG, IDG

25  Enterprise, and CXO. Paul Decl. ¶ 7. There are multiple executives who serve roles

26  across all these entities. *Id.* Aside from Mr. Bloom, Brian Glynn serves as Chief

27  Revenue Officer for both CXO and IDG Enterprise. Paul Decl. ¶ 8. IDG's website

28  indicates that Bob Bragdon is the SVP / Publisher, CSO. Paul Decl. ¶ 9. He is also

1  listed as the Publisher for CXO on CSOonline.com. *Id.* Similarly, IDG's website

2  indicates that Greg Pinsky is the SVP / General Manager, Digital Media Group.

3  Paul Decl. ¶ 10. He is also listed as the SVP / GM of Digital Operations for CXO.

4  *Id.* Pinsky's biography page at IDGenterprise.com explains that he "oversees the

5  media website development, and online account services and advertising operations

6  for multiple brands, including…CSO…". *Id.* And the About Us page for

7  CSOonline.com states it "is published by IDG Enterprise, which is an IDG

8  (International Data Group) company." Paul Decl. ¶ 11.

9      As home to technology industry giants such as Microsoft, Amazon, and

10  Expedia—and offices for Google, Facebook, and Apple—Washington houses

11  substantial numbers of the country's information security professionals, many of

12  whom read CSOonline.com. Paul Decl. ¶ 4. River City's business partners—many

13  of whom reside in Washington—also read or get information from news stories

14  published on CSOonline.com. *Id.* at ¶ 5. CSOonline.com has a wide reach with

15  respect to River City's customers and business partners in this District. *Id.* at ¶ 6.

16      The Ragan Article arises from the months-long computer hacking campaign

17  perpetrated by co-Defendant Vickery. Complaint at ¶¶ 38–63, ECF No. 1 at 7–11.

18  As more fully described in the Complaint, River City first discovered that it had

19  been the victim of a hacking campaign on or about January 16, 2017. *Id.* at ¶ 42,

20  ECF No. 1 at 7. Over the course of weeks, River City watched as its network

21  infrastructure was repeatedly attacked and severely damaged by a then-unknown

22  intruder. ECF No. 1 at 7–10. The intruder gained access to River City's computers

23  without authorization on numerous occasions and used that access to both send

24  commands to cause damage and to steal data. *Id.* Ultimately, the intruders revealed

25  themselves to be Vickery and those working with or for Vickery. ECF No. 1 at 8.

26      The IDG Defendants played a crucial role in Vickery's hacking campaign. On

27  behalf of and for the benefit of CXO, Ragan admitted on Twitter to assisting

28  Vickery with analyzing the enormous amount of information stolen from River

City. Ferris Decl. ¶ 28; *see also* Ragan Decl. ¶ 5, ECF No. 16 at 3. On his own Twitter feed, Vickery also thanked Ragan for his assistance in analyzing River City's data. Ferris Decl. ¶ 12. Ragan either knew or remained willfully ignorant of Vickery's hacking history and the fact that Vickery had done this exact same thing before—hacked illegally into a computer system and then claimed to have "inadvertently" discovered data, Complaint, ECF No. 1 at 6. For example, the BBC reported that Vickery was accused of hacking into uKnowKids.com's databases in February 2016. Complaint, ECF No. 1 at 6. Vickery's methodologies and his philosophy for finding data breaches are topics that he discusses extensively online. Paul Decl. ¶ 12.

The record proves the IDG Defendants knew that River City operated out of Washington and that the harm would be felt here:

1. Multiple documents posted publicly by Ragan and Vickery include address information for River City and its associated business partners (Ferris Decl. ¶¶ 25, 26, 29);

2. Spamhaus listed location information for Matt Ferris, and both Vickery and Ragan referenced that fact in their articles (Ferris Decl. ¶ 31); and

3. Vickery and Ragan had access to extensive IP address data, much of which pointed to Spokane, WA (Ferris Decl. ¶ 29)—for example, Ragan refers to TierPoint, an ISP, as being the only connection to the internet for Cyber World Internet Services (an entity linked to River City), both of which had Spokane IP addresses (*id.*);

4. The actual data that Ragan helped analyze was rife with references to Washington, indicating that the data itself likely came from Washington computers. *Id.*

The majority of the reputation injury suffered by River City occurred in Washington *because* the IDG Defendants published the Ragan Article on CSOonline.com, a widely-read news source for Washington's technology industry.

1  Paul Decl. ¶¶ 4–6, 16. For example, River City's internet service provider was
2  coerced into dropping River City from its network because of actions taken by the
3  IDG Defendants, Vickery and Spamhaus. Ferris Decl. ¶ 32; Ferris Decl. Ex. 5
4  ("TierPoint clipped the cord and disconnected [River City's] servers sometime on
5  Tuesday"). River City even lost its office because its offices were located in
6  TierPoint's facility, which, without internet access, became useless to River City.
7  Ferris Decl. ¶ 33.

8      River City's reputational injury also extended beyond Washington, just as
9  Defendants hoped. As reported by CXO and Ragan, "one of the largest marketing
10 firms working with RCM, Amobee, said the company was dropped from their
11 affiliate service." Ferris Decl. Ex. 5. Based on Ragan's article, Spamhaus
12 summarily blacklisted domain registrars affiliated with River City. Ferris Decl. ¶
13 34. This further eroded River City's ability to function and resulted in a near-
14 cessation of business activity. Ferris Decl. ¶ 35. Because of the loss of income and
15 business resulting from the cyberattack and Ragan and Vickery articles, River City
16 had to lay off 14 employees and direct contractors and shutter four businesses,
17 which in turn caused three additional businesses to close. Ferris Decl. ¶ 36.

18                          **III. DISCUSSION**
19  **A.   The IDG Defendants purposefully targeted River City's Washington-
        based business in their investigation and then published defamatory
20      articles directed to Washington citizens and businesses.**

21      Washington federal courts use the state's long-arm statute to determine
22 whether they may exercise jurisdiction over out-of-state persons.
23 RCW 4.28.185(1); *Chan v. Soc. Expeditions, Inc.*, 39 F.3d 1398, 1405 (9th Cir. 1994).
24 The Court considers two issues in determining whether defendants have
25 "purposefully established the minimum contacts with the forum state necessary to
26 grant personal jurisdiction." *Mirza Minds, Inc. v. Kenvox U.S. L.L.C.*, 2015 WL
27 6693689, at *1 (E.D. Wash. November 3, 2015); *see also Burger King v. Rudzewicz*,
28 471 U.S. 462, 472–73 (1985). First, the Court examines whether the defendants

PLAINTIFFS' OPP. TO DEFENDANTS IDG,
INC., CXO MEDIA INC. AND STEVE
RAGAN'S MOTION TO DISMISS - 5
[2:17-cv-00105]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

purposefully directed their activities at residents of the forum, and second, whether the litigation is a result of alleged injuries arising out of or related to those activities. *Genetic Veterinary Sciences, Inc. v. Canine EIC Genetics, LLC*, No. 13-cv-422-TOR, 2014 WL 2894301, at *4 (E.D. Wash. June 24, 2014).

If those factors are met, the Court determines if the exercise of specific personal jurisdiction would "comport with traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945). The Supreme Court's ruling in *Walden v. Fiore* focuses this Court's inquiry on defendant's contacts with Washington and clarifies that personal jurisdiction does not arise merely as a result of defendant's contacts with persons—even the plaintiffs—who reside there. 134 S.Ct. 1115, 1122 (2014).

Where, as here, the parties use affidavits to establish the factual bases for personal jurisdiction, plaintiffs need only demonstrate facts that, if true, would support jurisdiction. *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001) (overruled on other grounds by *Daimler AG v. Bauman*, 134 S.Ct. 746, 760 (2014)). Any uncontroverted allegations in the complaint must be taken as true and conflicts between parties' affidavits are resolved in plaintiff's favor. *Gordon v. Ascentive, LLC*, No. CV-05-5079-FVS, 2005 WL 3448025, at *1 (E.D. Wash. Dec. 15, 2005). The Court should construe all evidentiary materials in the light most favorable to River City. *Id.*

### 1. The IDG Defendants deliberately exploited Washington markets and published an article that was focused on Washington and caused harm in Washington.

There is no dispute that the IDG Defendants, via CSOonline.com, reach thousands or hundreds of thousands of readers in Washington on a monthly basis. Ferris Decl. ¶ 24, Ex. 4. Nor can Defendants reasonably dispute that their publications are widely read among the members of Washington's technology

industry.[1] CXO itself admits that Ragan acted with its knowledge and approval when it published the Ragan Article. Bloom Decl. CXO, ¶ 7. So there is no dispute that Ragan acted for the benefit of CXO and that CXO is responsible for Ragan's acts with respect to the Ragan Article. *Id.*

The effects of Defendants' defamatory statements, published online and read by potentially thousands of Washingtonians, are equally undisputed. As Defendants hoped, their news articles and false statements forced River City to drastically curtail its business operations. Ferris Decl. ¶¶ 32–36. River City lost its lease in a Liberty Lake, Washington office building and was forced offline because of pressure put on its Spokane-based internet service providers. Ferris Decl. ¶¶ 32–33.

The IDG Defendants knew that an article about a Spokane-based business would be most interesting to Washington readers and deliberately exploited Washington markets by publishing the Ragan Article on CSOonline.com where it was certain to be read by people in Washington's large technology industry. Paul Decl. ¶ 14. In both *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984) and *Calder v. Jones*, 465 U.S. 783, 788–89 (1984), the Supreme Court affirmed personal jurisdiction of forum states where allegedly libelous and defamatory articles were published as part of a nationwide magazine circulation but based on information from and felt most keenly in the forum state. In *Keeton*, a resident of New York brought a libel suit against an Ohio-based magazine publisher in a New Hampshire federal district court based solely on the publisher's sale of 10,000 to 15,000 copies of its nationally published magazine in New Hampshire. *See* 465 U.S. at 770–71. The Supreme Court found sufficient minimum contacts based on the regular circulation of magazines in the forum state.

---

[1] River City is entitled to conduct focused discovery regarding CSOonline.com's Washington viewership.

Similarly, in *Calder v. Jones*, a professional entertainer sued two newspapermen in a California court for an article written and edited in Florida, but circulated nationally. *See* 465 U.S. 783. The Supreme Court found that the newspapermen obtained information from California and then expressly aimed their article at California because they knew that the brunt of plaintiff's injury would be felt in California, where she lived and worked. *Id.* .at 789–90.

Just as in *Calder,* the IDG Defendants knew or should have known that the data they used to write the Ragan Article came from Washington state businesses. 465 U.S. at 778. And most significantly—and almost *exactly* as in *Calder*—the "brunt of the harm, in terms of both emotional distress and the injury to professional reputation" was suffered in Washington. *Calder*, 465 U.S. at 778–89. Given the many references to Washington, Defendants knew or should have known that Washington was—and is—the "focal point both of the story and of the harm suffered." *Id.* at 789.

The Supreme Court recently clarified personal jurisdiction in *Walden v. Fiore*. The *Walden* Court generally discussed *Calder* with approval, and explained that the "crux of *Calder* was that the reputation-based 'effects' of the alleged libel connected the defendants to California, not just to the plaintiff." *Walden*,  134 S.Ct. at 1123–24. The facts here are nearly identical but for the obvious differences in technology—*Calder* involved a nationally-circulated paper magazine whereas this case involves a nationally-read website. And though *Walden* acknowledges that it does not address intentional torts committed via the internet or other electronic means, the Ninth Circuit has not yet decided upon a different "express aiming" test just because a tort involves the internet. *Microsoft Corp. v. Mountain W. Computers, Inc.*, No. C14-1772RSM, 2015 WL 4479490, at *7 (W.D. Wash. July 22, 2015).

Succinctly put, this Court has personal jurisdiction over the IDG Defendants if their "suit-related conduct" created minimum contacts with Washington that

PLAINTIFFS' OPP. TO DEFENDANTS IDG, INC., CXO MEDIA INC. AND STEVE RAGAN'S MOTION TO DISMISS - 8
[2:17-cv-00105]

Newman Du Wors LLP

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

are not solely related to River City. The IDG Defendants deliberately exploit the Washington security news market. They reached out to Washington by publishing an article they knew or should have known would be widely read by Washington businesses and that used information obtained from Washington computers. As in *Calder*, the reputational injury caused by the Ragan Article "would not have occurred but for the fact that the defendants wrote an article for publication in [Washington] that was read by a large number of [Washingtonians]." *Walden*,  134 S.Ct. at 1124. The IDG Defendants have submitted to the personal jurisdiction of this state.

> **2.    This litigation is a direct result of the harm caused by the IDG Defendants' defamatory article in Washington.**

"The tort of libel is generally held to occur wherever the offending material is circulated." *Keeton*, 465 U.S. at 777. There is no dispute that the offending material in this case was circulated in Washington, which is exactly where River City's reputation and interests suffered the most harm. The facts alleged by River City match those of *Calder*. As the *Walden* Court explained, the Supreme Court in *Calder* noted that "the effects caused by defendants' article—*i.e.*, the injury to the plaintiff's reputation in the estimation of the California public—connected the defendants' conduct to *California*, not just to a plaintiff who lived there." *Walden*, 134 S.Ct. at 1124. Similarly, the IDG Defendants' publications connected their conduct to *Washington* and not just to River City who happen to be here. This litigation is therefore a direct result of the harm caused by Defendants' acts—acts which serve to connect them to the forum state.

**B.    The exercise of personal jurisdiction over the IDG Defendants is reasonable and comports with traditional notions of fair play and substantial justice.**

Courts must balance seven factors in evaluating whether the exercise of personal jurisdiction is "reasonable:" (1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendants of

defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum. *Amoco Egypt Oil Co. v. Leonis Nav. Co., Inc.*, 1 F.3d 848, 851 (9th Cir. 1993).

Each factor weighs in favor of exercising personal jurisdiction over the IDG Defendants:

1.  **Purposeful interjection:** The IDG Defendants purposefully interjected themselves into Washington's affairs by publishing defamatory articles that (1) caused immense harm to a Washington business and (2) necessarily interested Washington readers other than River City.

2.  **Relative burden:** Defending the case in Washington will not cause significant burden because (1) the IDG Defendants have already retained local counsel and (2) the internet makes it is as easy to defend this case as it was for the IDG Defendants to harm River City in the first place. Moreover, CXO is part of IDG, itself a global media corporation with immense resources. Litigating this case in Massachusetts is much more burdensome to River City—whose business has nearly collapsed. River City has no counsel in Massachusetts and would need to transport all evidence and witnesses there.

3.  **No conflict with Massachusetts's sovereignty:** Washington has a significant interest in adjudicating this dispute because of the harm to the Washington economy. River City employed individuals in Washington and had no choice but to terminate those employees because of the IDG Defendants' actions.

The remaining factors all weigh in favor of adjudicating the case in Washington. River City and the individual Plaintiffs live and are attempting to

1  rebuild their business in Washington. All the IDG Defendants have been served

2  with summonses issued from this Court. And there is no clear alternative given

3  River City's location and the disparate locations of the other Defendants.

4  **C.    This Court may exercise personal jurisdiction over IDG because it is a**
   **"super-corporation" engaged in technology media publishing and**
5  **marketing and its subsidiaries are its agents.**

6  If a "parent and subsidiary are not really separate entities, or one acts as the

7  agent of the other, the local subsidiary's contacts with the forum may be imputed

8  to the foreign parent corporation." *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668,

9  676 (D.C. Cir. 1996). An "alter ego or agency relationship is typified by parental

10  control of the subsidiary's internal affairs or daily operations." *Unocal Corp.*, 248

11  F.3d at 926. The Ninth Circuit recognizes the potential for finding *specific*

12  jurisdiction under general theories of agency. *Williams v. Yamaha Motor Co. Ltd.*,

13  851 F.3d 1015, 1024–25 (9th Cir. 2017). "Fundamental tenets of agency theory

14  require that an agent act on the principal's behalf and subject to the principal's

15  control." *Id.* at 1024 (quoting Restatement (Third) of Agency § 1.01 (2006)). If the

16  parent company "has the right to substantially control its subsidiary's activities,"

17  the subsidiary may be considered the agent of the parent. *Id.*

18  Here, the corporate structure of IDG, IDG Enterprise, and CXO is similar to

19  the "super-corporation" in *Bellamo v. Pennsylvania Life Co.*, 488 F. Supp. 744

20  (S.D.N.Y. 1980). In *Bellamo*, the court distinguished between holding companies

21  that acted as "nothing more than an investment mechanism" versus holding

22  companies that act as "super-corporations" engaged primarily in a specific

23  business or industry, such as the insurance holding company that engaged

24  "primarily in underwriting and selling a variety of insurance policies through

25  several subsidiaries." *Id.* at 746–47. Here, IDG acts as a "super-corporation," even

26  describing itself as "the world's leading technology media, data, and marketing

27

28

PLAINTIFFS' OPP. TO DEFENDANTS IDG,
INC., CXO MEDIA INC. AND STEVE
RAGAN'S MOTION TO DISMISS - 11
[2:17-cv-00105]

**NEWMAN DU WORS LLP**

2101 Fourth Avenue, Suite 1500
Seattle, Washington 98121
(206) 274-2800

services company."[2] IDG is not merely a holding company used to invest in diverse businesses through numerous subsidiaries. Instead, IDG shares executives between itself and its media-focused subsidiaries. IDG even identifies CSO as just one of twelve "brands," *all* of which are focused on technology-related news, media, and marketing.[3]

Because IDG is a super-corporation with subsidiaries acting as its agents, this Court may exercise personal jurisdiction over IDG based on CXO and Ragan's actions. Additionally, IDG is responsible for CXO and Ragan's acts as set forth below.

**D.    The IDG Defendants are not entitled to their attorney's fees.**

The IDG Defendants' request for attorney's fees should be denied. RCW 4.28.185 (5) allows a trial court to award attorney's fees to a prevailing out-of-state defendant who was personally served outside Washington. But the IDG Defendants have not prevailed. First, as established, this Court may reasonably exercise personal jurisdiction over the IDG Defendants consistent with Due Process and the IDG Defendants are thus not the prevailing party. Second, even if this Court grants the IDG Defendants' motions, this Court need not award attorney's fees. Fees under RCW 4.28.185 (5) are within the sound discretion of the trial court. *See Park Hill Corp. v. Don Sharp, Inc., Better Homes and Gardens*, 60 Wash. App. 283, 288–89 (1991) (affirming denial of attorney's fees because action was not frivolous and not brought to harass defendants, among other reasons) (overruled on other grounds by *Thompson v. Hanson*, 168 Wash.2d 738 (2009)).

---

[2] "Our Company," located at http://resources.idg.com/our-company, last visited May 3, 2017.

[3] "Properties," located at https://www.idg.com/properties/, last visited May 3, 2017.

River City's claims are not frivolous. The IDG Defendants caused harm here and River City's damages are felt here. Suing the IDG Defendants where the harm was felt comports with traditional pleading practices.

**E.    River City has stated plausible claims for relief with well-supported and well-pled factual allegations against the IDG Defendants.**

The Federal Rules of Civil Procedure require a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P 8(a)(2). To survive a motion to dismiss, a complaint must contain "sufficient factual matter" to state a claim to relief "that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). But Rule 8 does not require "detailed factual allegations". *Iqbal*, 556 U.S. at 678. River City's Complaint more than meets this standard with respect to the IDG Defendants and does not rely upon a mere "formulaic recitation of the elements of a cause of action." *Id.* When there *are* well-pleaded factual allegations, as is the case here, a court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

**1.    The IDG Defendants violated the CFAA, SCA, ECPA, and DFSA because they acted in concert to infiltrate River City's computers, damage River City's network, and expose River City's confidential trade secrets via defamatory articles.**

River City alleged detailed facts relating to Defendant Vickery's hacking campaign against its computer networks. Complaint, ECF No. 1 at 7–12. Defendant Ragan admits to having worked with Vickery on past stories. Ragan Decl. ¶ 5, ECF No. 16 at 3. Ragan does not testify that *he did not know* that Vickery had obtained the information Ragan used in the Ragan Article illegally. *Id.* In fact, Ragan knew or should have known that Vickery has been accused of unlawful computer intrusion in the past, as River City alleges. Complaint, ¶¶ 34–37, ECF No. 1 at 6. The pattern is unmistakable: (1) Vickery gains unauthorized access to computer systems, (2) steals data or causes damage, (3) claims to have "found" an unsecured database

online that he simply "stumbled upon" and (4) publishes those findings. *Id.* at ¶¶ 34–35.

Additionally, Vickery specifically thanked Ragan for his help analyzing the stolen data. Ferris Decl. ¶ 12. And even though the Ragan Article was not published until March 6, 2017, Ragan acknowledges that he has worked with Vickery since January 17, 2017. Ferris Decl. ¶ 28; Ragan Decl. ¶ 5. Because the computer hacking continued well *after* January 17, 2017, Ragan effectively admits to working with Vickery during the timeline of the devastating computer hacking campaign against River City. Ragan also used the stolen data to contact River City's business partners, including one of River City's ISPs, TierPoint. Ferris Decl. ¶ 22, Ex. 3 (referring to a statement by TierPoint in response to Ragan's inquiries).

River City alleges that "tens of thousands" of confidential, proprietary, and sensitive business records stolen by Vickery included client records, email lists, and other records containing sensitive business information constitute trade secrets used in interstate or foreign commerce. Complaint ¶ 104, ECF No. 1 at 17. Ragan and Vickery used their unauthorized access to steal and expose these trade secrets. For example, Ragan and Vickery disclosed a list of River City's associated corporate entities, which, in the internet marketing industry, is a trade secret and a necessary component of a successful business. Ferris Decl. ¶ 27. Defendants also disclosed other highly sensitive and confidential data, including domains and IP addresses used by River City to operate its network. *Id.*

As discussed above, Ragan acted in concert with Vickery to analyze—and possibly gain further access to—River City's data. There is no dispute that Ragan acted as CXO's agent and that CXO knew and approved of Ragan's actions in researching, writing, and publishing the Ragan Article. CXO, in turn, acted as agent for IDG.

1
2
3

**2. The Ragan Article published by the IDG Defendants constitutes defamation and intentionally inflicted emotional distress on the individual Plaintiffs.**

4  The IDG Defendants make three separate arguments for dismissal of the
5  defamation, invasion of privacy, and intentional infliction of emotional distress
6  claims. But all of Defendants' arguments rely on the disputed fact of the IDG
7  Defendants' participation in and knowledge of Vickery's illegal computer hacking.
8  As described above, Ragan did far more than simply republish information
9  provided to him by a third party. Ragan assisted Vickery in his analysis of the
10 *gigabytes* of data stolen from River City's networks. Ferris Decl. ¶ 12. Ragan
11 contacted River City's business associates and actively investigated River City's
12 business operations. Ferris Decl. ¶ 22, Ex. 3. And Ragan worked with Vickery
13 despite knowing of Vickery's past unlawful hacking campaigns. Given these
14 connections to Vickery, the IDG Defendants engaged in "extreme or outrageous"
15 conduct that caused damage to River City. The same intrusions into River City's
16 computer files constitute the complained-of invasion of privacy.

17 The IDG Defendants seem intent on arguing the merits of River City's
18 defamation case. In order to state a claim to relief for defamation under
19 Washington law, River City needs to allege facts to support four elements: (1) a
20 false statement; (2) publication; (3) fault; and (4) damages. *Duc Tan v. Le*, 188
21 Wash.2d 649, 662, 300 P.3d 356 (2013). River City alleges facts to support each
22 element. The Ragan Article contains false statements of fact about the legality of
23 River City's business. Complaint, ECF No. 1 at 11–12. False statements, even those
24 implied from an expression of opinion, constitute defamatory statements. *Duc Tan*,
25 188 Wash.2d at 663. The remaining three elements are not seriously disputed: the
26 IDG Defendants published the false statements on CSOonline.com and they are at
27 fault for the resulting damages sustained by River City. Complaint, ECF No. 1 at 2–
28 3, 11–13.

### 3. The IDG Defendants worked with and assisted Vickery in intentionally interfering with River City's contractual relationships and business expectancies.

The IDG Defendants did far more than publish an article about information received from a third party. Ragan admits to working with Vickery on articles over the course of years and knew or should have known that Vickery has been accused of hacking in the past. Ragan Decl. ¶ 5; Complaint, ¶¶ 34–37. Ragan also began receiving stolen data in January 2017 and spent about 45 days assisting Vickery with an analysis of that data for the purpose of publishing the Ragan Article. Ferris Decl. ¶ 28; Ragan Decl. ¶ 5. Not only did Ragan have actual knowledge of River City's existing contractual relationships because of the data he reviewed, but he also knew that his article would disrupt River City's business operations. Paul Decl. ¶ 14. Ragan even strongly implied that shutting down River City's business was his goal: "The problem is, organizations like River City Media use numerous aliases and affiliate programs, so while blocking their infrastructure will hurt, *there is no assurance it will put them out of business for good.*" Ferris Decl. ¶ 22, Ex. 3.

### 4. The IDG Defendants are liable for conversion perpetrated by their agent, Chris Vickery.

Vickery acted in concert with, or with the knowledge and approval of the IDG Defendants when he hacked into River City's computers and stole sensitive information, including credentials to River City's third-party accounts. When Vickery used those credentials to convert River City's funds to purchase domains, the IDG Defendants became liable for his acts as well.

## IV. CONCLUSION

The IDG Defendants spent almost two months processing data stolen from River City's Spokane servers as a result of the illegal hacking campaign. The IDG Defendants operate a national blog with wide readership in Washington's technology industry, and reap benefits from this District by having their blog (and

its associated advertisements) read here. The IDG Defendants then published a defamatory article widely read in Washington and causing harm to Spokane-based River City. The IDG Defendants knew that River City was based here and that the harm would be felt here. The IDG Defendants now seek to avoid liability for their actions by claiming that they can only be sued in their home states, even though those home states have no connection with this case other than that the IDG Defendants are headquartered there. The Court should deny their request and allow River City to prove its case on the merits.

Respectfully submitted May 5, 2017.


NEWMAN DU WORS LLP


Keith Scully, WSBA #28677
*keith@newmanlaw.com*
Leeor Neta, *admitted pro hac vice*
*leeor@newmanlaw.com*
2101 Fourth Avenue, Suite 1500
Seattle, WA 98121
(206) 274-2800

Attorneys for Plaintiffs

# CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2017, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of filing (NEF) to the following:

**Attorneys for Defendants International Data Group, Inc., CXO Media, Inc. and Steve Ragan**

Kevin J. Curtis
WINSTON & CASHATT, LAWYERS, a Professional Service Corporation
601 W. Riverside, Ste. 1900
Spokane, WA 99201
*kjc@winstoncashatt.com*

Charles L. Babcock
William J. Stowe
Jackson Walker L.L.P.
1401 McKinney Street, Suite 1900
Houston, TX 77010
*cbabcock@jw.com*
*wstowe@jw.com*

**Attorneys for Defendant Chris Vickery**

Aaron Rocke
101 Yesler Way, Suite 603
Seattle, WA 98104
*aaron@rockelaw.com*

Additionally, I caused true and correct copies of the foregoing to be served via first-class U.S. Mail, postage prepaid, with a courtesy copy by email to:

**Attorneys for Kromtech Alliance Corp.**
Matthew D. Brown
Cooley LLP
101 California Street, 5th Floor
San Francisco, CA 94111
*brownmd@cooley.com*

I declare under penalty of perjury that the foregoing is true and correct.

s/ Rachel Horvitz
_____
Rachel Horvitz
Paralegal