1

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF WASHINGTON

-------------------------------

```
RIVER CITY MEDIA, LLC, a        )
Wyoming limited liability       )
company, MARK FERRIS, an        )      NO. 1:17-CV-105-SAB
individual, MATT FERRIS, an     )
individual, and AMBER PAUL,     )
an individual,                  )
                                )
                 Plaintiffs,    )
                                )
           -vs-                 )
                                )
KROMTECH ALLIANCE CORPORATION,  )
a German corporation, CHRIS     )
VICKERY, an individual, CXO     )
MEDIA, a Massachusetts          )
corporation, INTERNATIONAL DATA )
GROUP, a Massachusetts          )
corporation, and STEVE RAGAN,   )
an individual, and DOES 1-50,   )
                                )      August 16, 2017
                 Defendants.    )      Yakima, Washington
```

-------------------------------

VERBATIM REPORT OF PROCEEDINGS
MOTION HEARING

BEFORE THE HONORABLE STANLEY A. BASTIAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR PLAINTIFFS RIVER CITY
MEDIA, MATT FERRIS, MARK
FERRIS AND AMBER PAUL:          LEEOR NETA
                                Attorney at Law
                                600 California St., Floor 11
                                San Francisco, CA 94109

                                JAKE BERNSTEIN
                                Attorney at Law
                                2101 Fourth Avenue, Suite 1500
                                Seattle, WA 98121

2

```
 1   FOR DEFENDANT KROMTECH
     ALLIANCE CORPORATION:        MATTHEW BROWN
 2                                CHRISTOPHER B. DURBIN
                                  AMY McCOWAN SMITH
 3                                Attorneys at Law
                                  101 California Street, 5th Floor
 4                                San Francisco, CA 94111

 5   FOR DEFENDANT CXO MEDIA
     AND INTERNATIONAL DATA
 6   GROUP AND STEVE RAGAN:       CHARLES L. BABCOCK
                                  WILLIAM J. STOWE
 7                                Attorneys at Law
                                  1401 McKinney Street, Suite 1900
 8                                Houston, TX 77010

 9                                KEVIN J. CURTIS
                                  Attorney at Law
10                                601 West Riverside, Suite 1900
                                  Spokane, WA 99201
11
     FOR DEFENDANT CHRIS
12   VICKERY: (Telephonically)
                                  AARON V. ROCKE
13                                Attorney at Law
                                  101 Yesler Way, Suite 603
14                                Seattle, WA 98104

15
     REPORTED BY:                 Lynette Walters, RPR, CRR, CCR
16                                Official Court Reporter
                                  P. O. Box 845
17                                Yakima, WA  98907
                                  (509) 573-6613
18
     Proceedings reported by mechanical stenography; transcript
19   produced by computer-aided transcription.

20

21

22

23

24

25
```

3

1                          I N D E X

2                                                    Page

3      Defendant IDG's Motion to Dismiss

4      Defendant CXO Media's and Steve Ragan's
       Motion to Dismiss
5
       Defendant Kromtech's Motion to Dismiss
6
           Argument by Mr. Babcock          4
7          Argument by Mr. Stowe            11
           Argument by Mr. Brown            17
8          Argument by Mr. Neta             26
           Argument by Mr. Babcock          40
9          Argument by Mr. Brown            44
           Argument by Mr. Neta             48
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (AUGUST 16, 2017, 1:30 P.M.)

2              THE CLERK:  The matter now before the court is River

3    City Media, Mark Ferris, and Amber Paul versus Kromtech Alliance

4    Corporation and others, Case No. 2:17-CV-105-SAB.

5              Counsel, please state your presence for the record,

6    beginning with plaintiffs' counsel.

7              MR. NETA:  Good afternoon, Leeor Neta for the

8    plaintiffs.

9              MR. BERNSTEIN:  Jason Bernstein for the plaintiffs.

10             MR. BABCOCK:  Your Honor, Charles Babcock for three of

11    the defendants, Mr. Ragan, IDG, and CXO.

12             THE COURT:  Very good.

13             MR. STOWE:  Your Honor, William Stowe, on behalf of

14    IDG, CXO, and Mr. Ragan.

15             THE COURT:  Very good.

16             MR. CURTIS:  Your Honor, Kevin Curtis on behalf of

17    those same three defendants, IDG, Ragan, and CXO.

18             THE COURT:  Very good.

19             MR. BROWN:  Matthew Brown for Kromtech Alliance Corp.

20             MR. DURBIN:  Chris Durbin also for Kromtech, Your

21    Honor.  Good afternoon.

22             THE COURT:  Good afternoon.

23             MS. SMITH:  Amy Smith for Kromtech.

24             THE COURT:  We have Mr. Rocke on the phone.  Can you

25    hear us okay, Mr. Rocke, or Rocke?

5

1          MR. ROCKE:  Yes, Your Honor, I can hear.  I just
2    turned the phone up a little to try to hear better.
3          THE COURT:  Is it Rocke or Rocke?
4          MR. ROCKE:  Rocke, Your Honor.
5          THE COURT:  Okay.  Apologize for that mistake.
6          I'm ready to proceed.  I'm assuming that we can do the
7    entire -- all of the hearings that we have pending in the next
8    hour, but let's figure out how to proceed.  We have three
9    different filed motions, International Data's motion, which is
10   at ECF No. 12, the motion filed by CXO Media and Ragan, which is
11   at ECF No. 14, and the motions filed by Kromtech Alliance, which
12   is at ECF No. 41.
13         And, so, I don't have a preference.  Have you
14   discussed how to proceed or who wants to go first?  If there's
15   an agreement, then let's do that.  If not, I have a suggestion.
16         MR. BABCOCK:  Can I go first?  I think we just made an
17   agreement that I would go first.
18         THE COURT:  All right.  That's fine.
19         The next thing -- and you can approach if you'd like,
20   Mr. Babcock.
21         MR. BABCOCK:  Thank you.
22         THE COURT:  But the next thing we should talk about is
23   how much time do you want, and, then, should we go to the other
24   motions before we hear from the plaintiff?  So I'm looking to
25   the plaintiff.  It seems easier if I just hear from you in

```
 1    response to everything at once.  If you wanted to respond to
 2    each of the three motions, I'll at least consider that.
 3              How would you like to do that?
 4              MR. NETA:  I think that's fine, Your Honor.  I'm happy
 5    to respond to all the motions at once, because I think the
 6    issues are very much related.
 7              THE COURT:  Yes, I think so, too.
 8              Mr. Babcock, how much time you need on behalf of your
 9    clients?
10              MR. BABCOCK:  Your Honor, on behalf of our clients, 20
11    minutes; 15 to open, 5 to close.
12              THE COURT:  All right.  And, then, who's going to be
13    arguing the other motions?  Mr. Brown?
14              MR. BROWN:  Yes.
15              THE COURT:  Is anybody else going to be arguing?
16              MR. BABCOCK:  Yes, Your Honor.
17              THE COURT:  I just want to get a sense as to who we're
18    going to be hearing from.
19              MR. BABCOCK:  The IDG defendants, I was going to
20    tackle the personal jurisdiction issue, and our alternative
21    12(b)(6) motion, Mr. Stowe was going to argue.
22              THE COURT:  All right.  And, so, your 15 minutes, does
23    that include both of your times?
24              MR. BABCOCK:  Yes, and that would include both of us.
25              THE COURT:  All right.  So we'll do 15 minutes between
```

1   the two of you, and then 5 minutes at the end.

2           And, Mr. Brown, how much time do you think you're

3   going to need?

4           MR. BROWN:  I think about the same, Your Honor.

5           THE COURT:  All right.  15 minutes.  Well, that's a

6   total of 30 minutes for the plaintiffs to respond to, and that

7   gets us to 1:30.  And, so, do you think 20 minutes -- and I'm

8   not real tight on time.  But if we start off with 20 minutes, do

9   you think that will be enough for you to respond to both

10  motions?

11          MR. NETA:  At present, that sounds like enough.

12          THE COURT:  Very good.  All right.

13          Mr. Babcock, let's get started.  I will watch the

14  clock.  As everybody in my chambers will tell you, I'm really

15  bad at that.  But I will try to give you about a two-minute

16  warning, and I'll try to read the clock.

17          MR. BABCOCK:  If you could give me a warning when I'm

18  five to seven minutes in, and then I'll defer to Mr. Stowe.

19          THE COURT:  Okay.  Generally, in that time frame.  All

20  right.  You may begin.

21          MR. BABCOCK:  Thank you, Your Honor.

22          May it please the court, I was struck, in looking at

23  the pleadings, about how nobody in this case is really connected

24  to Washington.  The first plaintiff, River City Media, is a

25  Wyoming LLC.  And we'd ask the court to take judicial notice of

1   the fact that River City Media is not licensed to do business in

2   Washington.  We had raised that in our briefing, and, frankly, I

3   thought that perhaps that might alert somebody to go get

4   registered, but we checked today, and River City Media is still

5   not registered to do business in the State of Washington.

6          And that has an impact on our 12(b)(2) motion in two

7   ways.  One, on the reasonable tests, whether Washington has an

8   interest in the adjudicating this dispute, we would say, because

9   of the Revised Code of Washington, RCW 23.95.505(2), River City

10   Media is not even entitled to bring an action until they do get

11   registered and pay all the back taxes for whatever time period

12   they have been doing business in the state.  Their pleadings say

13   that they are doing -- have been doing millions of dollars of

14   business here, so there could be some issue with the Washington

15   Secretary of State.

16          The second named plaintiff, Mr. Ferris, is a resident

17   of Idaho, he says in his declaration, Document 23.  The third

18   named plaintiff, Ms. Paul, likewise, is a resident of Idaho.

19   And Mr. Vickery, one of the defendants, is a California

20   resident, according to his declaration.  Kromtech, the plaintiff

21   alleges, is a German company with its headquarters in Dubai.

22          And then we get to my clients.  CXO is a Massachusetts

23   corporation, as is IDG.  And the defendant, Steve Ragan, the

24   individual defendant, Steve Ragan, who's an employee of CXO, is

25   a resident of Indianapolis, Indiana.  There's no dispute about

9

1   that.  That's either from the pleadings or the uncontroverted

2   affidavit.  So Washington, to us, doesn't seem to have much,

3   much to do with this dispute.

4           As to IDG, the allegation was that IDG was the parent

5   corporation of CXO.  The declarations that have been filed --

6   and they have not been controverted -- say that's not true.  IDG

7   is not in a parent/subsidiary relationship with CXO.  IDG is

8   merely a holding company.

9           There is no allegation as to general jurisdiction of

10  any of my clients, CXO, IDG, or Mr. Ragan.  Under the 2013 case

11  of *Daimler v. Bauman*, there really could not be a credible

12  allegation of general jurisdiction.

13          THE COURT:  In the plaintiffs' complaint, they

14  indicate, at paragraph 22, that IDG is the parent corporation of

15  Defendant CXO.  For purposes of the motion to dismiss, is that

16  sufficient?

17          MR. BABCOCK:  It is not if we controvert it.  Once

18  we -- it would be if we had not controverted it.  But once we

19  controverted it, then that goes away, and the burden shifts to

20  the plaintiff to come up with some evidence that we are the

21  parent.

22          In any event, it is, I think, well-established law

23  that the acts of a subsidiary in the forum for the purposes of

24  personal jurisdiction cannot be attributed to the parent.  It

25  really is of no moment here, because there are no acts of the

1    subsidiary that could be attributed one way or the other.  But

2    in answer to the court's question, yeah, that pleading goes away

3    once we controvert it.

4            As to specific jurisdiction, again, another case from

5    the United States Supreme Court, the *Walden* case, changed the

6    law in this circuit.  And, so, now, to sustain personal

7    jurisdiction, the suit must arise out of or relate to the

8    defendant's contacts with the state.  The mere fact that

9    defendant's conduct affects the plaintiffs in the forum is

10   insufficient.  And as I say, that, I think, changed the law in

11   the Ninth Circuit.

12           IDG -- there is no showing that IDG did anything with

13   respect to the plaintiff, whether it affected them in this forum

14   or not.  As for the other two defendants, there are allegations

15   that they were in some sort of conspiracy or some sort of joint

16   operation with the other defendants, most notably Mr. Vickery.

17   A judge who I'm told is extremely wise wrote an opinion

18   recently, 2015, in *Mirza Minds, Inc. v. Kenvox*, and that judge

19   noted correctly, we think, that bare assertions that a defendant

20   participated in the alleged conspiracy, and a legal conclusion

21   that, therefore, there was business being conducted in

22   Washington is insufficient, noting the Ninth Circuit precedent

23   prohibiting the conspiracy theory of personal jurisdiction.

24           Here, with respect to all the claims, there's a single

25   sentence that says --

1          THE COURT:  I think you heard wrong about the wisdom

2     of that --

3          MR. BABCOCK:  Excuse me?

4          THE COURT:  You heard wrong about the wisdom of that

5     particular judge.

6          MR. BABCOCK:  No, no.  I'm standing my ground on that,

7     Your Honor, I'm happy to say, since that opinion goes in our

8     direction.  If it had turned out otherwise, then we might have

9     had a debate about it, but...

10          So I think IDG, there really isn't much of an argument

11     to hold them in the case.  And I am not a proponent of the

12     English rule in terms of fee shifting, but in the case of IDG,

13     I really do think that the court should look at Section

14     4.28.185(5) and the cases under it, and consider, if you go in

15     our direction, awarding fees to IDG.  And we'd ask for the

16     opportunity, if it happens that way, to submit our fee

17     application and prove up our fees.

18          THE COURT:  What I've done in the past -- and I'm not

19     indicating to anybody how I might rule, but if I do rule in the

20     way you're requesting, and you think fees are appropriate, you

21     can do that with a subsequent motion.

22          MR. BABCOCK:  Thank you, Your Honor.  That was what I

23     was suggesting, perhaps inartfully.

24          So we get to the three-part test for specific

25     jurisdiction as to CXO and Mr. Ragan, did they purposely conduct

12

1    activities at the forum.  And there is, other than this

2    conspiracy, you know, sort of trying to bootstrap on

3    Mr. Vickery's alleged conduct, there is nothing to suggest that

4    this Indiana reporter working for a Massachusetts company

5    directed their activities in Washington.  He wrote an article.

6    He clearly interviewed a California resident.  And the article

7    was published on the Internet.  Nothing to suggest --

8            THE COURT:  I was just about ready to give you a time

9    signal.

10            MR. BABCOCK:  He's so eager.  You'll see.

11            THE COURT:  Mr. Stowe was giving you one.

12            MR. BABCOCK:  You'll see how eager he is.

13            So the first prong, we think, hasn't been met.  And

14    the second prong, the claims here do not arise from any activity

15    that my clients engaged in in this forum.  Again, the article

16    was prepared in Indiana and published out of Massachusetts.

17            And then the reasonable test.  The court's got -- the

18    Ninth Circuit has seven factors.  The court knows them as well

19    as I do.  It's in that masterful opinion that I cited earlier.

20            The only thing I would point out is Factor No. 4, the

21    forum state interest in adjudicating this dispute.  This forum,

22    Washington, has absolutely no interest in adjudicating a dispute

23    with a Wyoming LLC who has not bothered to register to do

24    business in the State of Washington.

25            I would yield to Mr. Stowe.

13

1           THE COURT:  All right.  Thank you.

2           MR. STOWE:  Good afternoon, Your Honor.  William Stowe

3    on behalf of IDG, CXO, and Mr. Ragan.

4           THE COURT:  How much time, at this point, do you need?

5    I'm going to be loose on the time, but we split up the 15

6    minutes.

7           MR. STOWE:  I'm going to try to knock this out in four

8    or five minutes.

9           THE COURT:  I'll give you a high sign at about five

10   minutes.

11          MR. STOWE:  Thank you, Your Honor.

12          Part of the reason I think I can knock it out in four

13   or five minutes is because it's an alternative motion, and

14   Your Honor doesn't even need to get to the Rule 12(b)(6)

15   analysis if it concludes, as we think it should, that there's no

16   personal jurisdiction.

17          But in any event, plaintiffs don't allege, or they

18   fail to state a claim against CXO, IDG, and Mr. Ragan.  And

19   starting with IDG itself, plaintiffs allege no facts whatsoever

20   of any conduct on the part of IDG, no participation in, engaging

21   in, connection to, any of the allegedly unlawful conduct.

22   There's just nothing against IDG.

23          Obviously, each one of the claims against IDG, against

24   CXO, and Mr. Ragan, as well, each require conduct on the part of

25   the defendant.  They don't allege any conduct on the part of

14

1    IDG.  What they do is they allege in paragraph 25, they make

2    this conclusory assertion about agency and ratification.  And we

3    gave Your Honor several cases that say if a plaintiff is relying

4    upon an agency theory, you have to plead specific facts

5    supporting that agency theory.  For example, Defendant A is able

6    to control Defendant B, and, hence, Defendant A would be the

7    principal of Defendant B.  But you can't say, as they have done

8    here, Defendant A is the principal for Defendant B.  So all of

9    the claims against IDG fail.

10           Similarly, the CFAA, the Computer Fraud, and the

11    Stored Communications Act, ECPA, claims against CXO and

12    Mr. Ragan fail because plaintiffs don't allege any intentional

13    accessing without authorization of facility through which an

14    electronic communication service is provided, or intentionally

15    exceeding the authorization provided.  It's all against

16    Mr. Vickery.

17           And the same shortcomings that go against with respect

18    to IDG also apply to CXO and Mr. Ragan.  They don't allege the

19    elements that I just mentioned with respect to the computer

20    claims.

21           The Defend Trade Secrets Act, they don't allege any

22    act of acquisition or disclosure against any of IDG, CXO, or

23    Mr. Ragan.  Those are required elements of the claim.

24    18 U.S.C. § 1839, Subsection(5).

25           They also don't even identify what the trade secret

1    is.  Failure to state a claim.  You've got to tell us what

2    the -- you don't have to go into specifics.  That's why it's a

3    trade secret.  But you've got to at least say what it concerns,

4    what that trade secret allows you to do.  They don't do that.

5          Intentional infliction of emotional distress.  They

6    don't allege any conduct that is extreme or outrageous.

7    Required element of the claim.

8          Invasion of privacy.  Don't allege any facts regarding

9    participation in the alleged intrusion into plaintiffs' private

10   affairs.

11         Conversion.  No allegation against any of IDG, CXO, or

12   Mr. Ragan regarding interfering with plaintiffs' chattel.  Same

13   thing with interference with contractual relationship or

14   business expectancies.  No allegations of specific conduct.

15   It's all about Mr. Vickery.

16         On to definitions.  IDG, they don't even allege

17   published anything.  That's the most basic element of

18   defamation.  You've got to publish the statement; you've got to

19   make the statement.  IDG, they don't even allege did that.  So

20   that point fails.  They don't state a claim against IDG for

21   that.

22         And as to CXO and Mr. Ragan, they get a little closer,

23   because at least they published an article, right?  They make

24   that allegation.  But if you look at specific statements that

25   they claim were defamatory, and they're all on paragraph 73,

1    none of those statements state a claim for defamation, for the

2    reasons that we identify in our brief.  A couple of them are

3    pure nonactionable opinions.

4            Interestingly, the statement that River City, quote,

5    exploited a number of providers in order to inbox offers,

6    unquote, they claim that that was defamatory.  And we gave

7    Your Honor a case, *Paterson v. Little Brown & Co.*,

8    502 F.Supp.2d 1124, which, similar context.  It was allegations

9    made in an article or publication regarding a computer

10   programmer way worse than this exploiting a number of providers.

11   There, they said in the statement that a computer programmer

12   had, quote, ripped off, unquote, and taken a ride on another

13   developer's operating software.  The court said that was

14   nonactionable opinion.  If that's nonactionable opinion, this

15   certainly, exploiting a number of providers, is not an

16   actionable opinion.

17           And the other statements that they -- in the interest

18   of time, I'm going to just kind of conclude here with respect to

19   defamation.

20           THE COURT:  You've got a couple minutes left.

21           MR. STOWE:  Oh, I do.  Okay.

22           All right.  Well, the other statement, they quote

23   Mike Anderson from Spamhaus, which is an organization, I

24   believe, that goes against spamming.  And they've got this quote

25   that they complain about that's from the article.  It's nobody

17

1  would knowingly give their e-mail address to spammers, so they

2  have to be tricked into it.  Again, that's nonactionable opinion

3  about what this Mr. Anderson believes the public would or would

4  not give to a spammer.

5          And, then, finally, the statement once we concluded

6  that this was, indeed, related to a criminal operation, they

7  claimed that was defamatory.  That's a quote to Vickery.  And

8  they don't allege what "this" means in that.

9          And then they include one more statement, which is

10  including a link.  They say you included a link in your article,

11  a hyperlink to the Vickery article, and that's defamatory.  We

12  gave Your Honor a very recent case from just last year, in 2016,

13  where the Washington Court of Appeals said that merely including

14  a hyperlink to another article that you say is defamatory is not

15  a republication.  And that case is *Life Designs Ranch, Inc. v.*

16  *Sommer*, 364 P.3d 129.

17          So for all of those reasons, they don't state any

18  claims against IDG, CXO, or Mr. Ragan.  But, again, Your Honor

19  doesn't even get there because there's no personal jurisdiction.

20          THE COURT:  All right.  Thank you.

21          Mr. Brown, should I time you at 15, leaving a few

22  minutes in reserve for rebuttal?

23          MR. BROWN:  Yes, please.  That would be great.

24          THE COURT:  All right.

25          MR. BROWN:  Again, Matthew Brown for Defendant

1   Kromtech Alliance Corp.

2           I will also start with the personal jurisdiction

3   argument.  And I think, as Mr. Babcock alluded to, the Supreme

4   Court, as well as the Ninth Circuit, but particularly the

5   Supreme Court, has really tightened up personal jurisdiction

6   jurisprudence over the last several years, and has made it clear

7   that it is a high bar.

8           By way of prefatory remark, I would also say, even

9   though it's our motion to dismiss, one thing that can easily get

10  lost, and I think it was lost somewhat in the plaintiffs'

11  opposition, is that it's really their burden to establish

12  personal jurisdiction, at least the two prongs, the purposeful

13  direction of conduct for the forum state, as well as the but-for

14  test.  That is, that that purposefully directed conduct must

15  form the basis for the claims that are alleged in this

16  litigation.  That's the plaintiffs' burden.  And, then, only if

17  they've satisfied their burden on those two prongs does it shift

18  to -- do you need to reach the reasonableness or due process

19  prong at all.

20          Here, as with the other defendants, I don't think

21  general jurisdiction is really on the table.  They certainly

22  don't raise it in their opposition.

23          So, turning to specific jurisdiction, on the

24  purposeful direction prong, we'll put aside the issue, just for

25  a moment, of agency.  But with respect to Kromtech Alliance

19

1    itself, they have no employees here, they have no officers here,
2    or anything like that.  The two things that they appear to seize
3    on in their opposition are what they characterize as two
4    advertisements on two websites.
5            First of all, the evidence that they've put before the
6    court is not competent evidence, and it should be disregarded.
7    It's an attorney declaration that sort of describes, in a very,
8    very vague way, these two advertisements, doesn't even bother to
9    attach screenshots or copies of these things at all.  So I think
10   that should just be disregarded, as well as the URL that was
11   provided that supposedly would lead to one of those two simply
12   didn't work when you go plug that into a browser.
13           But even if that evidence were to be credited, even
14   that doesn't show purposeful direction.  We have put in
15   declaration testimony from the CEO of the company that explained
16   how this actually works.  And it wasn't as though Kromtech
17   Alliance set out to run ads on these Washington-based websites
18   or the ad that was run by Yahoo!.  Lot of people think of Yahoo!
19   as a web portal, but they have a huge ad business, where they
20   display ads for other people.  And they have an arrangement with
21   Yahoo!, but they don't tell Yahoo!, go direct this to
22   Seattle-based papers websites.  It's up to Yahoo! to figure out
23   where to place those ads.  So they just say here's an ad that
24   we'd like to run.  That's all in the record.
25           With respect to the second piece of evidence that

1    they've kind of generally described in the attorney declaration,

2    the CEO of Kromtech has explained that was a press release that

3    was simply given to a PRWeb, which is a very well-known sort of

4    distribution company.  And, again, there was no direction to

5    PRWeb to target Washington in any way.  It was just generally

6    handed over a press release, and PRWeb, with its many, many

7    relationships across the country, sent it out to a whole bunch

8    of different news outlets.

9              Even if you were to get by all that and find that the

10   purposeful direction prong were met, none of this --

11             THE COURT:  But they did give direction to Yahoo! and

12   others to place the ad?

13             MR. BROWN:  That's correct.  That's right.  It's just

14   that there was no direction to target the ad toward Washington

15   state, which is really the key question for a personal

16   jurisdiction analysis.

17             THE COURT:  Was there a target or an instruction,

18   place the ad, but only do it in our home state?

19             MR. BROWN:  No.  I mean, Kromtech is a foreign

20   company.  So it doesn't -- it's not even an American company at

21   all.

22             THE COURT:  But they can be sued in the United States.

23             MR. BROWN:  Well, they -- if the requisite

24   requirements for personal jurisdiction were established by

25   plaintiff in a particular case.

1          THE COURT:  When Kromtech made this arrangement with

2   Yahoo! for the ads, did they understand that the ads would be

3   placed within the United States, that users of Yahoo! within the

4   United States would see these ads?

5          MR. BROWN:  That's just not in the record.  But in any

6   event, even if you were to find that the purposeful direction

7   were satisfied by plaintiff, none of this has anything to do

8   with the claims at issue here.  We're talking about generalized

9   arguments that have nothing to do with the alleged hacking

10   activity, nothing to do with the particular blog post at issue

11   at all.  So plaintiffs haven't carried the burden as to

12   Kromtech's actual conduct.

13          Faced with those shortcomings on that set of facts,

14   which clearly doesn't satisfy personal jurisdiction, they then

15   shift to this agency theory.  And we know from the *Wilcox* case,

16   a Washington Supreme court case earlier this year, that the key

17   consideration there is whether a company or a person has the

18   right to control the details of another person's work; in other

19   words, the right to control sort of the day-to-day activities.

20   Merely having the right to, you know, sort of direct the end

21   product or dictate what the end product is is not enough.

22          And if you look at the complaint itself, the four

23   corners of the complaint, all you really have there is a lot of

24   word play.  They say in a number of places, which you see

25   oftentimes in these complaints, that each defendant is the agent

22

1   of the other defendant.  But that's conclusory and should be

2   disregarded.

3           In their opposition brief, then, they tried to impute

4   Mr. Vickery's activities to Kromtech and argue that he was their

5   agent.  But the problem there is that the complaint doesn't

6   allege any facts that would show that Kromtech had the right to

7   control the details of his work.  And if they want to succeed on

8   an agency theory for personal jurisdiction purposes, they have

9   to do that, because that is the key consideration under the

10  *Wilcox* case.

11          Now, I think we, frankly, could have stopped there and

12  just pointed to four corners of the complaint, and I think we

13  should win on personal jurisdiction.  We elected to go farther.

14  And we've put evidence in the record.  And, so, in Mr. Sozniak's

15  declaration, CEO of Kromtech, he's attached the agreement

16  between Kromtech and Mr. Vickery.  And as you'll see, he's not

17  an employee, he's an independent contractor.  It's an arm's

18  length independent contractor agreement.  And all that that says

19  is it specified kind of the end product, right?  He will provide

20  some consulting services on security issues to the company up

21  to, I think it was, ten hours a month.  That's clearly not at

22  issue at all.

23          And, then, the other part of it is that he was

24  obligated to do two articles a month, essentially.  And there's

25  a general description of what those articles are to cover.  But

1    there's nothing in the contract at all that gives Kromtech the

2    right to control the details of any of his security research,

3    behavior, no ability to control the content of the articles,

4    exercise any creative control over the articles, any editorial

5    control, none of that.  And we've put that in the record so

6    that, you know, we can't be accused of hiding the ball or being

7    cute by only pointing to the allegations in the complaint.

8            I might also add that the blog where Mr. Vickery

9    posted these two articles a month was called "Security Watch

10   with Chris Vickery."

11           THE COURT:  I should have given you the two-minute

12   warning, but I haven't.  I realize -- I told you I was bad at

13   timekeeping.  I've let you go on longer than I should have, but

14   you can wrap up, and you can finish your thought.

15           MR. BROWN:  Yeah.  Maybe the last two things.

16           I sort of wanted to point out that, you know, I feel

17   that the lengths that the plaintiffs have gone to here to

18   persuade you of personal jurisdiction are pretty remarkable.  In

19   their opposition brief, they actually say that all of the

20   plaintiffs, both River City Media, as well as all the individual

21   plaintiffs, reside in Washington.  That's in the opposition

22   brief.  But we know it's flatly contradicted by their own

23   complaint, where they allege that it's a Wyoming LLC and --

24   River City Media, that is, and the individual defendants are all

25   residents of Idaho.  So if you are even to get to the third

24

1    prong, and I don't think you even need to, that's something that

2    should be taken into consideration in assessing reasonableness.

3           And I would point out the Ninth Circuit said, in the

4    *Amoco Egypt Oil Co.* case -- this is a 1993 case that we cited.

5    And they said there the unique burdens placed upon one who must

6    defend oneself in a foreign legal system should have significant

7    weight in assessing the reasonableness of stretching the long

8    arm of personal jurisdiction over national borders.  And that's

9    the situation we have here.

10          THE COURT:  Haven't those burdens changed since 1993

11   in terms of, you know, Mr. Rocke is allowed to participate by

12   phone.  I do a lot of phone hearings.  I do a lot of video

13   conference hearings.  Obviously, a trial is different.  But very

14   few cases actually go to trial.  The defendants, who are all

15   arguing that somehow this is burdensome, have found the means to

16   send three attorneys each for a motion to dismiss.  Haven't the

17   burdens changed somewhat, given the electronic age we're in,

18   which we were not in in 1993?

19          MR. BROWN:  Well, technology has certainly changed,

20   but I don't think it's -- not in a way that's material to this

21   analysis.  I mean, it certainly can't be the rule, and I'm

22   positive there's case law on this, that simply hiring counsel to

23   come and make a personal jurisdiction argument as opposed to

24   defaulting and having a default judgment entered, that --

25          THE COURT:  I guess my question is -- and I apologize

25

1   for interrupting you.

2           My question is this:  Certainly, it's the plaintiffs'

3   obligation to prove personal jurisdiction.  And the standards

4   haven't changed, and I'm not suggesting they should.  But in

5   terms of the one element, the burden, which all the courts who

6   have discussed personal jurisdiction, they all talk about the

7   burden of defending in a foreign jurisdiction, what is that

8   burden in this electronic age?  What is that burden?

9           MR. BROWN:  Sure.  Well, we don't have a client

10  representative here today.  We weren't going -- they weren't

11  going to fly from abroad to attend this hearing, which would be

12  their right.  And you've got a lot of clients who would be

13  highly interested in attending the hearings on their own case

14  where plaintiffs are suing them for lots of money.  And it makes

15  it extraordinarily burdensome in terms of the time, in terms of

16  the distraction from business, in terms of the expenses for them

17  to get here.  And, so, that applies --

18          THE COURT:  Could have tied them in by phone.

19          MR. BROWN:  That's different than being here in

20  person.

21          THE COURT:  Sure.

22          MR. BROWN:  In terms of depositions, and trials, and

23  the like, I understand your point that we are more -- granted,

24  we are a more interconnected world than we used to be, and I'm

25  not going to sit here and argue that we aren't.  But when we're

26

1   talking about a company that has its principal place of business

2   in Dubai, and here we are in the Eastern District of Washington,

3   that has to be taken into account.  And I think, you know, even

4   though this is a Ninth Circuit decision in 1993, I think the

5   general principle still stands and applies.

6          THE COURT:  No.  It's still good law.  And I didn't

7   mean -- sometimes what's important in 1993 changes by the time

8   we get to 2017.

9          MR. BROWN:  I guess I would just emphasize, you know,

10  I wanted to make that final point in the event that Your Honor

11  were to get to that third prong, but I just really think this is

12  a case where they haven't even established the first two prongs

13  and carried their own burden.

14         THE COURT:  Thank you, Mr. Brown.

15         Is it Neta?

16         MR. NETA:  Yes, Mr. Neta, Your Honor.

17         THE COURT:  And I assumed you're going to be making

18  the argument today.

19         MR. NETA:  I am I.

20         THE COURT:  Is your co-counsel going to split the time

21  with you?  He says no.

22         MR. NETA:  We're okay.  Thank you.

23         THE COURT:  We agreed to 20 minutes, so I'll give

24  you -- I'll try to give you a five-minute warning.

25         MR. NETA:  I have the same response to what counsel

27

1  mentioned, so I want to invite you, of course, to interfere with
2  any questions at any time.
3          First couple of things.  Counsel for Kromtech
4  indicates that River City Media is not registered to conduct
5  business in Washington.  But the fact of the matter is we have
6  evidence that demonstrates that our business was located here,
7  we had many employees in the State of Washington, we suffered
8  reputational damage in the State of Washington.  We can present
9  evidence, certainly, on that issue.  We lost our lease to our
10  office building in the State of Washington.
11          THE COURT:  Which means you had one.
12          MR. NETA:  We had one, at least, when we were in
13  active operation.  Now the business has been completely
14  eviscerated as result of defendant's conduct.  We laid off
15  numerous employees whose lives are in tatters, frankly, as a
16  result.  And I think there's enough evidence in the record at
17  this point to suggest, Your Honor, that defendants could have at
18  any point surmised that the plaintiffs are located in the State
19  of Washington.
20          The fact that the business was not registered to
21  conduct business in the State of Washington according to the
22  Washington court rules specifically, or that the fact that the
23  individuals may have resided in Idaho, right across that very
24  porous border, really has nothing to do with anything when the
25  damage was really felt here.

1          Counsel for IDG also mentioned that -- argues, as they

2     did in their papers, that IDG is not a parent company, but a

3     holding company.  I just want to explore, Your Honor, that if a

4     holding company is engaged primarily in a specific business or

5     industry, and the subsidiaries are doing the work that the

6     holding company would do, but for the existence of those subs,

7     they are essentially a supercorporation.  There's no difference.

8     And, in fact, there's enormous amount of evidence, even at this

9     early stage of the litigation, to suggest that IDG and CXO are

10     essentially the same entity, the same --

11          THE COURT:  But don't you have to plead that?  I mean,

12     that may be true.  This isn't a motion for summary judgment.

13     This is really a motion for both personal jurisdiction for all

14     the defendants, but, then, also, a motion to dismiss for,

15     really, inadequate pleading.

16          And did you plead that IDG, as either a parent company

17     or a holding company, should be held responsible for its

18     subsidiary, CXO, for the following factual reasons?

19          MR. NETA:  I don't believe it's as clear as it could

20     be.  I certainly have to concede that.  And if the response is

21     that we simply need to amend it to more clearly characterize it

22     with the evidence that we've obtained in the meantime related to

23     the close interrelation of CXO and IDG, we're happy to do that.

24          But the notion that they're not deeply wedded together

25     as a supercorporation, and that IDG can simply stand back, allow

29

1    the subsidiary, quote, companies to engage in conduct around the

2    country, and it's not liable because it's standing aside isn't

3    fair enough to absolve them from liability.

4            THE COURT:  Well, that may be, but I think that's a

5    different motion, a different time, if we get beyond this.  You

6    know, there are certain rules that you have to follow to pierce

7    the corporate veil and to move from one corporate entity to

8    another, if you want to do that, and you can try to do that if

9    you want to.

10           The question is:  Does this complaint sufficiently put

11   the defendants and the court on notice in terms of what your

12   theory is?  And I, you know, I think the Ninth Circuit has

13   instructed trial judges like me that if we're going to grant a

14   motion to dismiss, that the plaintiff rarely -- rarely should

15   the plaintiff not be given a chance to amend.  So that probably

16   would happen if I end up granting the motion to dismiss.

17           So I'm going to suggest it might be your best use of

18   time today to talk about the personal jurisdiction --

19           MR. NETA:  Understood.

20           THE COURT:  -- because that's where I think, if I

21   grant that motion, that's where your case is going to be over.

22           MR. NETA:  That makes sense, Your Honor.

23           Let's talk about purposeful direction, then, first.

24   As we indicate in our briefing, libel occurs wherever the

25   offending material is circulated.  And we've described a number

1    of cases that demonstrate.  It doesn't really matter where the

2    defendant is.  Doesn't even really matter where the plaintiff

3    is.  If there's demonstrated harm in a given jurisdiction,

4    that's enough for purposeful direction.

5              The victim of the libel, like the victim of any other

6    tort, may choose to bring suit in any forum with which defendant

7    has certain minimum contacts, such that maintenance of the suit

8    does not offend traditional notions of fair play and substantial

9    justice.

10        THE COURT:  So that answers why Vickery is in this

11   lawsuit.  And I will take judicial notice of the fact that he

12   doesn't have a pending motion, anyway, on personal jurisdiction.

13   But how do we get personal jurisdiction against these other

14   defendants who you're alleging were working or somehow

15   responsible for Mr. Vickery?

16        MR. NETA:  I think the evidence, if not as clearly

17   stated as it could be in the complaint, certainly is stated well

18   enough, I think, in our opposition and the record as it stands,

19   that Mr. Ragan and Mr. Vickery were working hand in hand

20   investigating River City Media, a company based in Washington,

21   trying to undermine its business, posting defamatory statements

22   about it online, that they were working hand in hand, it wasn't

23   simply an issue of Vickery doing a lot of this work and handing

24   it on a platter to Mr. Ragan, who then wrote a story about it.

25        THE COURT:  So, in essence, Mr. Vickery's involvement,

1    and Mr. Ragan's involvement, at least your allegation, were

2    really similar.  They weren't employees, or they weren't

3    business partners.  They were working independently, but

4    together, and, so, if we have jurisdiction over one, we have

5    jurisdiction over the other.

6              MR. NETA:  Precisely.  And that, in turn, extends to

7    CXO.  CXO, for its part, makes no effort in its briefing to

8    dispute the fact that Mr. Ragan is its agent.

9              And with respect to CXO/IDG, again, the question, I

10   think, ultimately is, are these companies really a parent/sub

11   sort of a scenario -- situation, or is it really a

12   supercorporation in which they are so interrelated they're doing

13   essentially the same thing.

14             THE COURT:  So your argument in terms of personal

15   jurisdiction over Kromtech is that Mr. Vickery was its agent?

16             MR. NETA:  That's correct, Your Honor.

17             THE COURT:  And in terms of Mr. Ragan/CXO, Mr. Ragan

18   was CXO's agent?

19             MR. NETA:  That's correct, Your Honor.

20             THE COURT:  We have a different level of involvement

21   with IDG, but that's a different issue.

22             MR. NETA:  True.

23             Kromtech, for its part, engages Mr. Vickery, executes

24   this contract.  Now, Mr. Brown suggested earlier that Kromtech

25   doesn't really have any control over Mr. Vickery's actions.

1          THE COURT:  But that's a motion for summary judgment,

2     isn't it?

3          MR. NETA:  I would think so, too.  And I would think

4     the contract, in and of itself, probably demonstrates at least

5     the requisite consent/approval conduct required.  Because I

6     don't think there's any dispute Mr. Vickery couldn't blog

7     whatever he wanted on a website that was owned by Kromtech under

8     the MacKeeper.com domain name.  It asserted some control over

9     him.

10          And you're right, to the extent there's an open

11     question on that, let's take discovery on that and address it on

12     a summary judgment motion.

13          As I said, I don't think there's any dispute in the

14     record, at least at this point, that Ragan, Mr. Ragan, is CXO's

15     agent.

16          THE COURT:  So how do we get personal jurisdiction

17     over IDG?

18          MR. NETA:  Well, given that CXO published this article

19     online, they circulated in Washington, they knew Washington

20     citizens would read it just because of the fact that the

21     business was located here.  It was easy enough for them to find

22     that out.  They targeted Washington consumers.  They knew that

23     it would be of interest to Washington residents.

24          If you take all that evidence, and you marry the fact

25     that CXO and IDG are essentially the same thing, that's how you

1    get IDG in the State of Washington.

2              THE COURT:  Okay.  Is there any dispute between the

3    parties as to whether Mr. Vickery was actually the -- or

4    Mr. Ragan -- so I guess my question is to both -- whether they

5    were the trespassers, I would say, the people who snooped into

6    your clients' computer information and trespassed, I'll call it.

7              MR. NETA:  As far as I know, Your Honor, there's no

8    dispute on that issue.  And there's an enormous amount of

9    evidence that we've collected that connects each of these pings

10   and efforts to unlawfully access our servers --

11             THE COURT:  I'm not asking for your opinion.

12             MR. NETA:  Okay.

13             THE COURT:  I'm just wondering --

14             MR. NETA:  If it's at issue.

15             THE COURT:  -- is that at issue?

16             MR. NETA:  I don't believe it is, Your Honor, no.

17             THE COURT:  Okay.  I've chewed up a lot of your time,

18   but you still have plenty.

19             MR. NETA:  You're welcome to.

20             So in terms of purposeful direction, I think we've

21   addressed that question.  They produced articles, they

22   circulated them in the State of Washington, they knew that the

23   harm would be felt there.  Despite their assertions to the

24   contrary, I think there's enough circumstantial evidence to

25   suggest they should have known that or did know that.

34

1          And as we've discussed, and as I think the defendants

2    do not dispute, defamation occurs in the state where the harm is

3    most likely to be felt.  And that was felt here.  Certainly,

4    there's an enormous amount of evidence in the record about how

5    the harm was felt in this state.

6          Quickly -- how much time do you think I have,

7    Your Honor?

8          THE COURT:  Well, I was going to give you the

9    five-minute warning in about five minutes.  So you have ten

10   minutes.

11         MR. NETA:  Ah.  Okay.  I'm not sure I'm going to take

12   all of my time, then, Your Honor.

13         THE COURT:  Wait a minute.  Yeah, you've got 10

14   minutes if you want it.

15         MR. NETA:  Okay.

16         THE COURT:  All right.  I was thinking that there was

17   going to be a rebuttal from you, but there really wouldn't be.

18         MR. NETA:  There might not be.

19         With respect to the reasonableness factors, the seven

20   factors, again, purposeful interjection, I think it's clear from

21   the record that there was that with respect to the State of

22   Washington.

23         The burden on the defendants, as Your Honor noted,

24   earlier, it has changed quite a bit in the last 24 years.  It is

25   quite easy for parties to litigate a case online in this era.

35

 1  Certainly, parties are free to attend, but it's very easy to
 2  take depositions by video, to participate by phone call.  And
 3  there's no question that we could do a lot of that in this case,
 4  should need arise.
 5          THE COURT:  Well, it was an issue when I was in
 6  practice, and I went through in practice over and over and over
 7  with cases that I worked on, that when you're -- I think this is
 8  the rule generally -- when you're the plaintiff, and you want to
 9  take a deposition of somebody who lives in Dubai, you either
10  have to do that on the phone, by video, or go to Dubai.  It's
11  pretty rare that you're going to get a court to agree to force
12  that Dubai witness to the State of Washington.
13          MR. NETA:  On tissue of Dubai, I was just litigating
14  days in the Northern District of California.  Again, I was the
15  plaintiff, representing the plaintiff in that case.  The
16  defendant was a free-zone LLC, a Dubai free-zone LLC, and the
17  CEO of that company was based in Dubai, and I had to take that
18  deposition over video.  It's certainly something that I think
19  technology allows us to do rather fluidly.
20          THE COURT:  The point I'm trying to make is that the
21  burden of this out-of-jurisdiction litigation, we'll call it,
22  falls on both sides.
23          MR. NETA:  I think that's right.
24          And on that issue, as an extension the question of ads
25  being placed in the State of Washington vis-a-vis elsewhere in

36

1    the United States, you're absolutely right, Your Honor, if --

2    unless, unless a company is specifically not trying to focus

3    their efforts and attentions on a given state, the fact that

4    they are asking Yahoo! or some other affiliate to place

5    advertisements somewhere in the United States that has a

6    footprint in the State of Washington, they should accept the

7    fact that that's going to be -- that's going to give rise,

8    potentially, to a jurisdictional argument there.

9            Certainly, in the State of Washington, there's an

10   enormous amount of industry related to security research, and

11   breach, and protection.

12           THE COURT:  Seems to me -- you know, it's a number of

13   years ago that I took civil procedure in law school, which is

14   probably true for everyone in this courtroom.  But it seems to

15   me, as we go through changes in the way we do business, that

16   seems to prompt changes in the law regarding personal

17   jurisdiction.

18           I just wonder if we're at that point where -- when I

19   was in law school, the changes were, you know, the use of

20   telephones and fax machines.  Now it's electronic, and you can

21   put an ad here in the State of Washington on Yahoo!, or Google,

22   or Facebook, and it can be read by someone in Dubai, and your

23   product can be purchased.

24           MR. NETA:  They certainly gain the benefit of being

25   able to advertise in this state.  Why shouldn't there be a

37

1    corresponding burden?

2            And you're absolutely right, the arc of cases with

3    respect to personal jurisdiction and minimum contacts, if you

4    want to think broadly, over the last hundred years, is

5    consistently bent towards this zone in which people are,

6    jurisdiction is held because, from a technological perspective,

7    it's very easy for all litigants to participate in the case.

8    It's never been something that has arisen as an issue, I think,

9    in any cases that I've helped that have dealt with this fear of

10   industry.

11           THE COURT:  Okay.

12           MR. NETA:  I think the other issues with respect to

13   reasonableness all weigh in our favor.  There's no serious

14   conflict between our state and any of the other states where

15   defendants are located.  We do have a significant interest in

16   hearing this case here because of the damage that was caused to

17   Washington employees, Washington residents.

18           And, most importantly, before I end, I don't think

19   that there's any alternative forum.  Defendants have all

20   indicated to you we have Mr. Ragan located in Indiana, CXO and

21   IDG that are located in Massachusetts, and Kromtech, which we

22   alleged in our pleading was a German company, but in their

23   declaration state that they're a British Virgin Islands

24   corporation, with its principal place of business in Dubai.

25           If the case doesn't proceed in Washington, where the

38

```
 1   witnesses with respect to harm and damage and reputation
 2   aren't -- are located, then where else would it take place?
 3           THE COURT:  I take note of the fact that -- I realize
 4   you start with a three-part test, and with each of those parts
 5   you've got seven parts, and it's just too many parts to look at,
 6   but we'll look at them all.
 7           But it comes down to, really, this general rule:  The
 8   personal jurisdiction is governed -- and this is what every case
 9   says -- minimum contacts are required.  Minimum contacts are
10   required.  But the intent is to do fair play and substantial
11   justice.
12           MR. NETA:  Right.
13           THE COURT:  Does that weigh into your argument in any
14   way?
15           MR. NETA:  Absolutely, Your Honor.  The conduct that
16   we've alleged, and the evidence that we have presented in
17   support of it, all demonstrate that numerous employees lost
18   their jobs, lost their livelihoods, have suffered enormously.
19   Businesses were lost, businesses were eviscerated.
20           As of today, River City is no more.  River City, a
21   Washington business, even though it wasn't registered to conduct
22   business in the State of Washington, even though it's
23   incorporated elsewhere, located in the State of Washington,
24   suffered enormous harm.  And forcing River City to essentially
25   litigate this case in Indiana, Massachusetts, or, God forbid,
```

39

1    Dubai, would not comport with notions of substantial justice or

2    fair play, especially given that they've hired counsel that have

3    appeared here, admitted pro hac vice, and seem to be prepared to

4    defend this case.

5           THE COURT:  Do you have to be registered in the State

6    of Washington to do business in the State of Washington?

7    Corporate law was not my specialty when I was practicing, and I

8    just haven't had to look at that issue.

9           MR. NETA:  As far as I understand, Your Honor, if the

10   rules are anything like California, and I believe they are

11   somewhat, you don't need to be registered in the State of

12   Washington to conduct business in the State of Washington.

13          But that, in and of itself, Your Honor, isn't even a

14   jurisdictional question.  Companies from Wyoming, from Germany,

15   from anywhere, can hang out a shingle in a state and conduct

16   business.  And there may be a question as to whether or not

17   they'd be allowed to defend a suit brought against them or

18   enforce a contract that they enter into with an in-state

19   resident, but that doesn't enter into the question of

20   jurisdiction.

21          THE COURT:  Okay.

22          MR. NETA:  And if you have any other questions.

23          THE COURT:  I don't have any other questions.  You

24   have more time, but you don't have to use it.

25          MR. NETA:  I will save it for rebuttal, if need be.

40

```
1            THE COURT:  All right.
2            MR. NETA:  Thank you, Your Honor.
3            THE COURT:  All right.  Mr. Babcock, I'll give you
4    five minutes.  Do you want to share that with Mr. Stowe?
5            MR. BABCOCK:  No, I'm done sharing with him.
6            THE COURT:  Does Mr. Stowe want you to share it?
7            MR. BABCOCK:  He probably does.  He's eager, you know,
8    always.
9            I was not and am not a corporate law specialist, but I
10   did read the Washington Revised Code, and, on registration, if
11   they gross more than $12,000 a year, they're required to
12   register with the Secretary of State here.  And if they don't,
13   they can't pursue a lawsuit until they do register and pay their
14   back taxes.
15           THE COURT:  Is that true for federal courts as well?
16   I just don't know.
17           MR. BABCOCK:  Would that be true in federal court?  To
18   be honest with you, I don't know.  But the statute doesn't make
19   a distinction between state and federal court.  But the answer
20   is I don't know --
21           THE COURT:  Okay.
22           MR. BABCOCK:  -- on that.
23           You talked about how the burden has changed because,
24   you know, we're flying out from all different places, and we've
25   got the Internet and everything.  And I think it's a fascinating
```

41

1    point.  Mr. Stowe and I actually were talking about it last

2    night.  The ease of travel, and the ease of communication has

3    dramatically changed since *International Shoe*, and when

4    Mr. Kroll would have had to, you know, hitch up the wagon and

5    put all his trial boxes in there and come across the country to

6    litigate a case.  And yet, and yet, in the past three years, the

7    United States Supreme Court, which, obviously, is the supreme

8    law of the land, has tightened up personal jurisdiction.

9    Remarkably so.

10          And one of the cases is pertinent to the argument that

11   plaintiffs' counsel made, but *Daimler v. Bauman* has very much

12   constricted general jurisdiction.

13          *Walden v. Fiore*, which is the case that I think

14   impacts here, has changed the effects test.  He argues --

15   counsel argues that, well, they lost their lease, you know,

16   they've got employees who were affected, and this is all

17   happening in Washington, and so the effect of this, of this

18   publication by my client and by the other defendants has

19   affected them here.

20          Well, *Walden* says that, straight up, the suit must

21   arise out of or in relation to defendant's contacts with the

22   state.  The mere fact that defendants conduct activities affects

23   it in the forum, that the defendant's conduct affects plaintiffs

24   in the forum, is insufficient.  That's a change, clearly a

25   change in the law.  I'm surprised that they didn't overrule the

42

1    *Jones* case.  But, nevertheless, that's what we've heard.

2              This term, in *Bristol-Myers*, they said that that

3    general and specific jurisdiction are entirely different,

4    distinct tests.  It's error to allow the factors relevant to one

5    to influence the other.  That's constricting personal

6    jurisdiction.  This term they said, in *BNSF Railway v. Tyrrell*,

7    that legislative venue choices don't affect personal

8    jurisdiction.

9              So, yeah, life has gotten easier, but the Supreme

10   Court has not expanded jurisdiction.  In fact, it's gone the

11   other way.  And, you know, we think that the *Walden* case is just

12   straight on point.  The plaintiffs cannot be the only link

13   between the defendant and the forum, the Supreme Court says in

14   *Walden*.  Rather, it is the defendant's conduct that must form

15   the necessary connection with the forum state that is the basis

16   for its jurisdiction over him.  And --

17             THE COURT:  Mr. Babcock, maybe I'm making this too

18   simple.  And if I am, that's why I ask the question, and you can

19   tell me.  But if the plaintiffs have personal jurisdiction over

20   Mr. Vickery, don't they also have the jurisdiction over

21   Mr. Vickery's principal?  Now, I realize that you may be arguing

22   that there's no principal/agent relationship, but that's not

23   really the purpose of the hearing today.

24             MR. BABCOCK:  Right.  Well, I don't think there's been

25   an allegation that Mr. Vickery is our principal -- is our agent.

43

1          THE COURT:  I should have used Mr. Ragan, then, for
2   your client.
3          MR. BABCOCK:  Mr. Ragan would be different.
4          THE COURT:  Thank you.
5          MR. BABCOCK:  And their allegation about Mr. Ragan is
6   only that he interviewed or talked to a California resident and
7   published an article.
8          Now, they do have a conclusory pleading in all their
9   causes of action that says this, and I'll take their first cause
10  of action.
11         THE COURT:  What paragraph are you on?
12         MR. BABCOCK:  Paragraph 83, they talk about Defendant
13  Vickery.  This is their first cause of action.  This is repeated
14  in all but their defamation and tortious interference.
15         So, paragraph 83 Vickery.  Paragraph 84, Vickery.
16  Paragraph 85, Vickery.  Paragraph 86, Vickery.  Paragraph 87,
17  Vickery.  Paragraph 88, Vickery.
18         And then we get to paragraph 89.  Vickery undertook
19  these actions personally and with the knowledge, approval,
20  and/or ratification of Kromtech, CXO, Ragan, and the remaining
21  defendants.  I assume that they mean, by that, IDG.
22         That is the only allegation in their causes of action.
23  And that's repeated in paragraph 97, 106, 115, 121, 139, 147.
24  And as you pointed out in the *Mirza Minds* case, that is just not
25  enough.  And we could leave it right there based on their

44

1  pleading, but we took it further, and we have uncontroverted

2  declarations from CXO, from IDG, from Mr. Ragan, that he's --

3  they have no relationship with Mr. Vickery other than as a

4  source for a news article.

5           And, you know, we pointed out that even if one

6  assumes, as is alleged, that Mr. Vickery was engaged in improper

7  conduct, the Supreme Court case, *Bartnicki v. Vopper*, says that

8  the press, you know, is not liable for those things unless it

9  participated in the underlying criminal misconduct.

10          So, from a jurisdictional standpoint, they haven't

11  even pled anything.

12          THE COURT:  You're at your five minutes.

13          MR. BABCOCK:  Excuse me?

14          THE COURT:  You're at your five minutes, but I'll

15  allow you to wrap up.

16          MR. BABCOCK:  Okay.  Thank you.

17          THE COURT:  So for all the above-stated reasons,

18  you're asking for a dismissal.

19          MR. BABCOCK:  Yes, for the foregoing reasons,

20  Your Honor, we will submit that our motion ought to be granted.

21          Thank you.

22          THE COURT:  Thank you, Mr. Babcock.

23          Mr. Brown, I'll give you five minutes.

24          MR. BROWN:  Thank you.

25          So I'll just try to hit a few very focused issues,

45

1    since this is rebuttal.  One point that I would make is, you

2    know, there's been -- I just want to make sure that we're

3    staying focused on what the, what the actual test is.

4              THE COURT:  You really mean me being focused, right?

5              MR. BROWN:  No.  And counsel as well.  I think

6    Mr. Neta very ably took the argument in a direction that was

7    favorable to his position.  But, you know, we have to be careful

8    not to allow a personal jurisdiction discussion to get into this

9    kind of generalized gestalt sense of whether it would be, you

10   know, too difficult to participate in things by telephone or hop

11   on a plane.  There's a very kind of regimented test that they

12   have to go through.

13             And I agree wholeheartedly with Mr. Babcock's sort of

14   gloss on the last several years of Supreme Court jurisprudence.

15   There's really no getting around it once you dig into that case

16   law.  The Supreme Court has tightened this up a lot.

17             And the *Walden v. Fiore* case, to come back to that, a

18   2014 case, so a very recent case, there's an interesting passage

19   here.  The court stressed, and I'm quoting:

20                   Due process limits on the state's adjudicative
                     authority principally protect the liberty of
21                   the nonresident defendant, not the convenience
                     of plaintiffs or third parties.
22

23             So the focus, as has been very clear, is on the

24   liberty interests of defendants, not on the convenience of

25   plaintiffs.  It can be very, very easy to lose sight of that

1    when we're talking about all these other considerations,

2    particularly in the third prong, which you shouldn't even get

3    to.

4            I would also just add that even with the sort of

5    increasing prevalence of the Internet and how interconnected we

6    are, it still hasn't led to universal jurisdiction, right?  So

7    that if that were really the driving consideration, it wouldn't

8    even matter what kind of case it was, right?  Basically, it

9    would just be in the realm of universal jurisdiction.  But the

10   Supreme Court and appellate courts there haven't gone that

11   route.

12           THE COURT:  We're not there yet.

13           MR. BROWN:  What's that?

14           THE COURT:  We're not there yet.

15           MR. BROWN:  Not yet, and maybe never.

16           Secondly, just to reiterate, Mr. Neta, in his

17   argument, yet again, said that the fact that the damages were

18   felt in Washington state was enough.  And that's just simply

19   flat out wrong under the case law.  The *Walden* case, again, said

20   and I quote:  As previously noted -- there was a whole

21   discussion about this.

22           As previously noted, *Calder* made clear that
         mere injury to a forum resident is not
23        sufficient connection to the forum."

24           Straight up.  That was the case about seizure of money

25   in the airport in Georgia by law enforcement, and the people

47

1    whose money was seized lived in Nevada, and they held no

2    personal jurisdiction over law enforcement officer in Nevada.

3    And that was the case even though, even though the respondents

4    lived in Nevada and couldn't access the funds there that had

5    been seized.  The police officer, who was basically authorized

6    to be a DEA agent, submitted a false affidavit, knowing that it

7    would cause foreseeable harm to respondents in Nevada.  That's

8    considered a fact that the court considered.

9            The respondents' Nevada attorney had communications

10   with the law enforcement officer in Georgia.  Some of the cash

11   that was seized had originated in Nevada.  The funds were

12   eventually returned to Nevada.  All of those didn't matter.

13   Still no jurisdiction.

14           And then I might just also touch on this issue of

15   agency, which, obviously, as Mr. Neta has conceded, is the

16   critical issue for them on personal jurisdiction as it pertains

17   to Kromtech Alliance Corp.  And Your Honor may have indicated,

18   or at least floated the idea that this would be something to be

19   addressed in summary judgment, not now.  I don't agree with

20   that.  I think it can absolutely be dealt with now at the motion

21   to dismiss stage.

22           And if you look at the *Wilcox* case, again, Washington

23   Supreme Court case from earlier this year, in -- that was also a

24   case that involved a contract.  And the parties had sort of

25   differing views on the contract.  And the court itself even

1   said, at first blush when we looked at the contract, we thought

2   there might be contradictory provisions.  But the court dug into

3   the contract, interpreted it, and held as a matter of law that

4   there was no agency, no right to control the details of the work

5   there.

6          So in that same way, there's really no reason that it

7   can't be dealt with as a matter of law.  And we don't need to

8   get into discovery, and then all the way through to the motion

9   for summary judgment, only to litigate the issue of whether

10  there's sufficient agency showing to hale Kromtech into court in

11  Washington.

12         THE COURT:  Okay.  You're at your five minutes.  If

13  you want to wrap up, you may.

14         MR. BROWN:  I am wrapping up.  Thank you.

15         THE COURT:  Thank you, Mr. Brown.

16         Mr. Neta.

17         MR. NETA:  Very brief, Your Honor.

18         THE COURT:  I typically don't do this.  Let me

19  explain.  I'll give you two minutes.  It is not your motion, but

20  it is your burden.  So I think, since you're facing six against

21  two, I'll give you two minutes to sum it up.

22         MR. BABCOCK:  Fair fight, Your Honor.

23         MR. NETA:  Thank you.  I'll keep it very brief.

24         The Washington statute that was referenced earlier, I

25  believe it's discretionary, and I don't think it has any impact

1   on federal courts.  While it might be true that the Supreme

2   Court has tightened up general jurisdiction, I don't believe

3   that's the case with specific.  And it's certainly not the case

4   of Internet actions.

5          A lot has been discussed about the *Walden* case, but I

6   just want to quickly bring your attention --

7          THE COURT:  And you're proceeding only under specific

8   jurisdiction --

9          MR. NETA:  That's correct, Your Honor.

10         THE COURT:  -- for all of the defendants, is my

11  impression, after reading all the briefing.

12         MR. NETA:  Precisely.  If you look at Footnote 9 of

13  the *Walden* case, it says specifically:

14              ... this case does not present the very
               different question whether and how
15             defendant's virtual "presence" and conduct
               translate into "contacts" with a particular
16             State. ... We leave questions about virtual
               contacts for another day.
17

18         So while that case did have something to say about

19  constraining specific jurisdiction, it doesn't have any impact

20  on this case, because that's not what this case is about.  It's

21  about Internet damage, Internet advertising commerce.

22         Quickly, on the issue of agency, I think there's

23  enough evidence in the case so far to indicate that Kromtech had

24  some agency control over Mr. Vickery.  And as I said earlier,

25  CXO doesn't really dispute the notion that they had agency

50

1    control over Mr. Ragan.  There is a question about CXO and IDG

2    and to the extent to which they're interrelated, but all I would

3    say in response to that, Your Honor, is if you feel that

4    question needs to be more appropriately addressed in the

5    pleadings, we're happy to take jurisdictional discovery on

6    certain questions so that we can resolve that issue.

7              THE COURT:  Okay.  Thank you.

8              MR. NETA:  Thank you, Your Honor.

9              THE COURT:  All right.  I'll try to get a decision out

10   as soon as I can.  I do have a week-long trial that begins on

11   Monday, so that will probably get in the way of this a little

12   bit, but we'll work on it, get it out as soon as we can.  It

13   will be a couple weeks.

14             But I've enjoyed our time this afternoon.  And thank

15   you for being prepared, organized, and efficient.

16             MR. NETA:  Thank you.

17             MR. BABCOCK:  Thank you, Your Honor,

18        (ADJOURNMENT at 2:39 P.M.)

19

20

21

22

23

24

25

51

1                        REPORTER'S CERTIFICATE

2

3

4

5          I, LYNETTE WALTERS, Registered Professional Reporter,

6    Certified Realtime Reporter and Certified Court Reporter;

7          DO HEREBY CERTIFY:

8          That the foregoing transcript, Pages 1 through 50,

9    contains a full, true, complete and accurate transcription of my

10   shorthand notes of all requested matters held in the foregoing

11   captioned case, including all objections and exceptions made by

12   counsel, rulings by the court, and any and all other matters

13   relevant to this case.

14         DATED this 12th day of September, 2017

15

16

17                              s/ Lynette Walters
                                LYNETTE WALTERS, RPR, CRR, CCR
18                              CCR NO. 2230

19

20

21

22

23

24

25